FILED IN CLERKS OFFICE
NOV 17 '25 AM3:54 USDC MA

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| RYAN J. CAPUANO,<br><br>Plaintiff,<br><br>v.<br><br>GATES MEDICAL RESEARCH INSTITUTE, f/k/a BILL & MELINDA GATES MEDICAL RESEARCH INSTITUTE,<br><br>Defendant. | Civil Action No. __________<br><br>COMPLAINT AND DEMAND FOR JURY TRIAL<br><br>(Pro Se) |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

**INTRODUCTION**

1. Plaintiff Ryan J. Capuano brings this action against his former employer, Gates Medical Research Institute, formerly known as the Bill & Melinda Gates Medical Research Institute ("Gates MRI"). Every claim arises from a single series of events that Gates MRI set in motion on the night of July 23, 2025. Those events continued through September 11, 2025, nine days after Plaintiff returned from approved medical leave, when Gates MRI told him his employment was ending. They ended on November 10, 2025, when Gates MRI required him to sign a release of all claims to receive severance and paid health coverage.

2. The series began with Gates MRI. On the evening of July 23, 2025, after a stressful exchange at work, Plaintiff called a crisis line for someone to talk to and told Gates MRI's head of human resources that he needed to go to the hospital. Gates MRI then called the police. The Boston Police incident report lists the reporting party as "Stephanie," calling from (650) 417-1595, the mobile number of Gates MRI's human resources lead, Stephanie Boggier. MGH recorded the next day that Gates MRI human resources had "called 911." Officers responded at about 11:17 p.m. for a "well-being check." Plaintiff told them he wanted to go to a hospital. Boston EMS found Plaintiff "calm and cooperative," denying any thought of harming himself or anyone else, and recorded that he "wants to seek services at the hospital."

3. Within about 45 minutes of his arrival at Massachusetts General Hospital ("MGH"), MGH applied to hold Plaintiff involuntarily under G.L. c. 123, § 12(a). No one at MGH told him he could have a lawyer appointed, could ask a judge for an emergency hearing, or could accept voluntary status.

4. At 12:22 p.m. on July 24, 2025, MGH's own psychiatric nurse practitioner wrote that Plaintiff "does not meet Section 12 criteria," rated his risk "Low," and planned a likely discharge. MGH did not release him. Instead, it took a telephone call from Gates MRI's head of human resources, who had not seen Plaintiff that day. She told MGH that he had been aggressive and threatening toward his manager, that coworkers feared him, and that he was "recently divorced" with a "custody issue." Those statements were false and are contradicted by every first-hand observation in the record. That call was the only new information MGH recorded. About five hours later, the same nurse practitioner signed a second Section 12(a) application sending Plaintiff to McLean Hospital. As evidence she cited "erratic behavior" that only Gates MRI had reported, and she left blank the certification that she had examined him.

5. As a result, Plaintiff was moved from one locked psychiatric setting to another without ever being told he could ask a judge to review his detention, and no judge ever did. McLean found that same evening that his risk was "Low," and it later concluded that he had a "[n]ormative response to psychosocial stressor" and "does not meet any DSM criteria." He was discharged on July 28, 2025, after about four and a half days of confinement.

6. From the first day, Gates MRI also controlled Plaintiff's leave. On July 24, 2025 it told him to take paid time off rather than leave, deactivated his building badge, and required him to contact HR before returning. It did not give him the FMLA notice he asked for. When he said he was ready to work, it asked him to stay out and set conditions on his return. Gates MRI's leave administrator approved his leave through September 1, 2025, and he returned on September 2. Nine days later, on September 11, 2025, Gates MRI told him his employment was ending.

7. Plaintiff asserts claims against Gates MRI for retaliation and interference under the Massachusetts Paid Family and Medical Leave law ("PFML"), G.L. c. 175M, and the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et seq.; disability discrimination and retaliation under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., and G.L. c. 151B; false imprisonment by instigation; defamation; and violation of the Massachusetts Civil Rights Act. He also seeks a declaration that the release Gates MRI required him to sign does not bar these claims.

**PARTIES**

8. Plaintiff Ryan J. Capuano resides in Worcester, Massachusetts. At the time of the events of July 2025, he resided at 656 Saratoga Street, Apt. 203, East Boston, Massachusetts 02128. His driver's license then listed a different address, 8 Curtis Street, East Boston. He worked for Gates MRI as a Contracts and Procurement Administrator.

9. Defendant Gates MRI (employer identification number 82-1808476) is a nonprofit biotech accelerator with its principal office at One Kendall Square, Building 600, Suite 6-301, Cambridge, Middlesex County, Massachusetts 02139. Gates MRI is an "employer" within the meaning of 42 U.S.C. § 12111(5), 29 U.S.C. § 2611(4), G.L. c. 151B, § 1(5), and G.L. c. 175M, § 1. On information and belief, it employed more than 50 employees within 75 miles of Plaintiff's worksite. Gates MRI is responsible for the acts of its officers and human resources personnel described in this complaint.

10. Non-party The General Hospital Corporation d/b/a Massachusetts General Hospital operates the hospital and emergency department at 55 Fruit Street, Boston, where Plaintiff was held on July 23–24, 2025. Non-parties Mariel White, PMHNP-BC, Jonathan E. Slutzman, M.D., Sahand Babapoorfarrokhran, M.D., Ph.D., and Rachel L. MacLean, M.D. (the "MGH Clinicians") are clinicians who treated Plaintiff there. Plaintiff does not assert claims against them in this action and reserves all such claims.

## JURISDICTION, VENUE, AND ADMINISTRATIVE PREREQUISITES

11. This Court has jurisdiction over Counts II through V under 28 U.S.C. § 1331, 42 U.S.C. § 12117(a), and 29 U.S.C. § 2617(a)(2).

12. This Court has supplemental jurisdiction over the remaining counts under 28 U.S.C. § 1367(a). They form part of the same case or controversy because they arise from one series of events: Gates MRI's report that brought emergency services to Plaintiff, the information Gates MRI supplied that was used to continue and extend his detention, the medical leave that followed, and the termination of his employment nine days after his return.

13. Venue is proper under 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3). Gates MRI resides in Massachusetts, and the events took place in Suffolk and Middlesex Counties.

14. Plaintiff contacted the EEOC on May 6, 2026 and filed Charge No. 523-2026-02859 on June 5, 2026, alleging retaliation after approved medical leave, within 300 days of the unlawful practices. During the EEOC's processing of the charge, the investigator asked Plaintiff to identify his disability. On June 20, 2026, Plaintiff provided the EEOC with his treating provider's attending physician statement describing his condition and hospitalization. On June 18, 2026, he identified Ms. Boggier as Gates MRI's contact. On July 29, 2026, he sent the EEOC supporting documents, including: Gates MRI's July 24, 2025 email directing him to take paid time off; his separation agreement and Gates MRI's departing-employee confidentiality letter; his Massachusetts paid leave application, certification of serious health condition, and approval notice; his provider's attending physician statement; and his McLean and primary care return-to-

work letters. The EEOC was thus on notice of Plaintiff's hospitalization, his medical leave, his condition, and the disability basis of his claims. The charge was filed with both the EEOC and, under the work-sharing agreement, the Massachusetts Commission Against Discrimination ("MCAD"). Plaintiff has no record that the MCAD assigned a separate docket number. More than 90 days have passed since that filing, so Plaintiff may bring his G.L. c. 151B claims in court under G.L. c. 151B, § 9. The charge named Gates MRI as the respondent. The EEOC issued a Determination and Notice of Rights on August 21, 2026, listing Gates MRI as the respondent (Exhibit 1). The EEOC closed its investigation without a determination on the merits and stated that this "does not mean the claims have no merit." (Id.) Plaintiff received it on August 21, 2026 and files this action within 90 days. The claims in this complaint are reasonably related to the charge. The FMLA and PFML claims require no administrative charge and are timely under 29 U.S.C. § 2617(c) and G.L. c. 175M, § 9(d).

**GOVERNING LAW ON EMERGENCY PSYCHIATRIC DETENTION**

15. Under G.L. c. 123, § 12(a), certain licensed clinicians may restrain a person and apply for that person's hospitalization for a three-day period, but only "after examining" the person and only if the clinician has reason to believe that failure to hospitalize would create a likelihood of serious harm by reason of mental illness. The examination may be dispensed with only where it is impossible because of the emergency nature of the case and the person refuses to be examined. Leininger v. Franklin Med. Ctr., 404 Mass. 245 (1989).

16. Under G.L. c. 123, § 12(b) and 104 CMR 27.07, a person may be admitted on a Section 12 application only after a designated physician or qualified advanced practice registered nurse of the facility examines the person and authorizes the admission.

17. Under G.L. c. 123, § 12(b) and 104 CMR 27.07, before a person is admitted on a Section 12 application, the facility must give the person the opportunity to apply for voluntary or conditional voluntary status. It must also tell the person that, on request, it will notify the Committee for Public Counsel Services ("CPCS") so that counsel may be appointed. And it must inform the person of the right to request an emergency court hearing if the person believes the admission results from an abuse or misuse of Section 12. These are the means by which a person held under Section 12 can bring the detention before a judge.

18. Confinement in an emergency department under Section 12(a) is consistent with due process only if it lasts no longer than necessary. Massachusetts Gen. Hosp. v. C.R., 484 Mass. 472 (2020).

19. G.L. c. 123, § 22 grants immunity from civil damages to clinicians who restrain, transport, apply for or admit a person only where they act in accordance with Chapter 123. Conduct that departs from the statute is not immunized. Section 22 does not protect a private person who supplies false information to bring about a detention.

## FACTS

### A. Plaintiff's employment at Gates MRI

20. Plaintiff worked for Gates MRI, first as a contingent worker and then, from February 8, 2021, as an employee, until his separation on November 10, 2025. Gates MRI's annual reviews of his work were positive. The most recent, for 2024, called it a good year and described him as a strong individual contributor. In May 2025, Gates MRI set goals for Plaintiff's position that ran through the fourth quarter of 2025.

21. Before July 23, 2025, Plaintiff had received no formal discipline.

### B. July 23, 2025: Plaintiff seeks help, and Gates MRI calls the police

22. On the evening of July 23, 2025, after a stressful exchange at work, Plaintiff spoke with a coworker and then called a crisis line because, as he later told MGH, he "felt unsafe" and "needed someone to talk to." (Ex. H at 2.) He did not report any intent or plan to harm himself or anyone else. (Id.)

23. At approximately 10:00 p.m., Plaintiff called the 988 Lifeline. He spoke with the line for about 45 minutes and "felt really good after talking." (Ex. H at 2; Ex. P at 2.)

24. That evening Plaintiff also contacted Stephanie Boggier, Gates MRI's Senior People & Business Enablement Lead, who handled human resources matters for him, through Gates MRI's workplace messaging application. He told her he needed help and needed to go to the hospital. (See Ex. P at 2; Ex. H at 4–5.) That exchange is stored on Gates MRI's systems. Plaintiff no longer has access to those systems and will seek the complete exchange from Gates MRI in discovery. On information and belief, Ms. Boggier is also the Gates MRI human resources representative who spoke with MGH on July 24, 2025, and whom MGH's records call Gates MRI's "head of HR." This complaint therefore refers to her as Gates MRI's "head of human resources" when describing MGH's records.

25. According to MGH's note of its later call with Gates MRI's head of human resources, it was Gates MRI human resources, not the crisis line, that "called 911" after Plaintiff "stopped answering" instant messages. (Ex. H at 4–5.)

26. The Boston Police Department's report of the call confirms this. Incident Report I# 252060027 (CAD Event No. P250352154) identifies the reporting party as "Stephanie UNKNOWN," a woman, with the telephone number "(650) 417-1595 (primary, Mobile Phone)." (Ex. W at 1–2.) That is the mobile number Ms. Boggier lists in her Gates MRI email signature. It is also the number Gates MRI's Chief Operating Officer gave Plaintiff for Ms. Boggier in her July 24, 2025 email. The report records the reporting party's relationship to Plaintiff as "acquaintance," not employer. (Ex. W at 2.)

27. According to the report, "[a]bout 11:17 PM on Wednesday 07/23/25," two Boston Police officers "responded to a radio call for a well-being check" at Plaintiff's apartment, 656 Saratoga Street, Apt. 203, East Boston. The report codes the incident as "SICK ASSIST," lists Plaintiff as the "victim," and records no suspected alcohol or drug use. (Ex. W at 1–2.) The officers arrived unannounced. Plaintiff had not called 911 and did not know the police had been called.

28. The officers went to 656 Saratoga Street, Apt. 203, the apartment where Plaintiff was living. (Ex. W at 1–2.) Plaintiff had lived at 8 Curtis Street, East Boston, until May 2025, and moved to 656 Saratoga Street, Apt. 203 on June 1, 2025, less than two months before the events of July 23. His driver's license still listed 8 Curtis Street. Plaintiff has no record of notifying Gates MRI of his new address before July 23, 2025. The records of that night are inconsistent about his address: (a) the police report gives the incident location as 656 Saratoga Street, Apt. 203, but his "home address" as 655 Saratoga Street (Ex. W at 1–2); (b) Boston EMS lists 656 Saratoga Street (Ex. A at 1); and (c) MGH's Section 12 application and McLean's forms list 8 Curtis Street, Apt. 3, the license address (Exs. E, J, L). Plaintiff did not call 911 himself. On information and belief, Ms. Boggier gave the dispatcher Plaintiff's new address and apartment number. How she knew them is a question the 911 recording, the dispatch record, Gates MRI's Workday address-change history, and Gates MRI's device-management records will answer. Plaintiff did not give them to her. On information and belief, she obtained them from the crisis line, from another source, or from location data on a device Gates MRI managed. Plaintiff did not give his address or apartment number to Ms. Boggier that night.

29. The officers wrote that Plaintiff "stated that he did not feel safe," that he "kept stating to officers that his workplace was monitoring his every move including all of his cell phones," that "he doesn't have anyone to talk to about his problems," and that he "wanted to go to a hospital." (Ex. W at 1.) The officers did not mark the report's "Section 12" box. Boston EMS evaluated Plaintiff and transported him to MGH. (Id.)

30. The report shows that the officers' body-worn cameras were activated, and it links to an associated record titled "Request EMS and BPD video" on Evidence.com. (Ex. W at 1, 3.) That video will show Plaintiff's demeanor and words that night.

31. Boston EMS was dispatched at 11:27:52 p.m., about ten minutes after the police arrived, and reached Plaintiff at 11:35:20 p.m. (Ex. A at 3.) The call was coded "EMOTIONALLY DISTURBED PERSON | NO INDICATION OF VIOLENCE." (Id.) EMS found Plaintiff "alert and oriented x4" and "calm and cooperative," and he denied "making any specific plans," hallucinations, suicidal ideation, and homicidal ideation. EMS recorded that he "states he wants to seek services at the hospital," rated his acuity "Lower Acuity (Green)," and recorded the reason for choosing MGH as "Patients Choice." (Ex. A at 1, 3.)

32. Even so, EMS recorded a primary impression of "Suicidal Ideation," and MGH recorded "Suicidal" as the chief complaint at triage. (Ex. A at 1; Ex. B; Ex. C at 1.) The police call was for a "well-being check," and the officers did not record any statement by Plaintiff about suicide. (Ex. W at 1.) On information and belief, the "suicidal" label came from what the caller told the dispatcher, not from anything Plaintiff said or did. MGH's triage note also records, "per ems report," that Plaintiff's "[b]oss called police due to statements made." (Ex. B.) The EMS report itself contains no such statement. (Ex. A.) The police report confirms that the caller was Gates MRI's human resources lead. (Ex. W at 1–2.)

33. According to MGH's psychiatric consultant, the Boston Police reported that Plaintiff "was brought in because he wanted to talk to someone at the hospital" and "was not acutely suicidal or agitated." (Ex. F at 3.)

34. Plaintiff arrived at the MGH Emergency Department at 11:57:50 p.m. on July 23, 2025. (Ex. A at 1.)

**B-1. Timeline of the night of July 23–24, 2025**

35. The records establish the following sequence: (a) evening of July 23: Plaintiff calls a crisis line, speaks with it for about 45 minutes, and messages Ms. Boggier that he needs help and needs to go to the hospital (Ex. H at 2); (b) Plaintiff then "stopped answering" Ms. Boggier's instant messages (Ex. H at 4–5); (c) Ms. Boggier, from (650) 417-1595, reports Plaintiff to the Boston Police (Ex. W at 1–2); (d) about 11:17 p.m.: officers arrive for a "well-being check" and Plaintiff tells them his workplace is monitoring him and that he wants to go to a hospital (Ex. W at 1); (e) 11:27:52 p.m.: Boston EMS is dispatched, coded "NO INDICATION OF VIOLENCE" (Ex. A at 3); (f) 11:35:20 p.m.: EMS finds Plaintiff "calm and cooperative" (Ex. A at 1, 3); (g) 11:49 p.m.: the police report is entered (Ex. W at 1); (h) 11:57:50 p.m.: Plaintiff arrives at MGH (Ex. A at 1); (i) 12:42 a.m. on July 24: MGH signs the first Section

12(a) application (Ex. E); (j) 12:22 p.m.: MGH's nurse practitioner finds Plaintiff "does not meet Section 12 criteria" (Ex. H at 5); (k) afternoon: Gates MRI's human resources lead calls MGH with the statements described in ¶ 54 (Ex. H at 4–5); (l) 5:45 p.m.: the second Section 12(a) application sends Plaintiff to McLean (Ex. J); and (m) 8:30 p.m.: Plaintiff arrives at McLean (Ex. Q at 1).

**<u>B-2. Plaintiff's monitoring concern, and why the 911 call matters</u>**

36. On the night of July 23, 2025, Plaintiff told the responding officers that his workplace was monitoring his every move, including all of his cell phones. (Ex. W at 1.) Plaintiff does not allege here, as an established fact, that Gates MRI monitored his personal communications. He alleges that the records needed to answer that question are held by Gates MRI and by the agencies that received Gates MRI's call.

37. Several facts make the question a serious one. Ms. Boggier called the police after Plaintiff stopped answering her messages, although he had told her he was seeking help and going to the hospital. The police report records her, at her own mobile number, as an "acquaintance" of Plaintiff rather than his employer's human resources lead. The next day, Gates MRI gave MGH detailed statements about Plaintiff's conduct, family, and coworkers' fears, although its human resources lead had not seen him. (Ex. W at 1–2; Ex. H at 4–5.)

38. Gates MRI paid Plaintiff a "Cell Phone Usage" allowance in his paychecks, including throughout 2025, reflecting his use of a phone for Gates MRI work. Plaintiff's work email signature listed a separate work number, (714) 791-2008. Plaintiff used his own phone for Gates MRI work, and Gates MRI work applications were installed on it. On information and belief, Plaintiff signed a Gates MRI mobile-device policy as a condition of using his phone for work. On information and belief, Gates MRI had technical access to, or management control over, at least one phone Plaintiff used. Gates MRI's device-management and security records will show what access it had and whether it used that access in July 2025.

39. The 911 recording and computer-aided dispatch record of Ms. Boggier's call are essential evidence. They will show what Ms. Boggier told the police, where she was when she called, what address and apartment number she gave, what information she said she was relying on, whether anyone else at Gates MRI was involved, and whether she referred to any of Plaintiff's communications other than his messages to her. On information and belief, the recording may show that Gates MRI was monitoring or had access to Plaintiff's communications, including communications on his personal cell phones, beyond its own workplace systems.

40. If Gates MRI or anyone acting for it secretly recorded or intercepted Plaintiff's oral or telephone communications without his consent, that conduct would violate the

Massachusetts wiretap statute, G.L. c. 272, § 99, which provides a civil remedy in § 99(Q). Plaintiff does not assert that claim in this complaint. He will seek leave to amend to add it if the 911 recording, the body-worn camera video, the call-detail records, or Gates MRI's own records show such interception.

**C. MGH files a Section 12(a) within 45 minutes, despite no reported risk**

41. At triage at 12:02 a.m. on July 24, 2025, Plaintiff denied suicidal ideation, homicidal ideation, and hallucinations. (Ex. B.) MGH's Columbia Suicide Severity Rating Scale screen returned "No Risk Indicated." (Ex. F at 2.)

42. At 12:22 a.m., Physician Assistant Gracelyn Oesterle recorded the plan to "initiate Section 12," before any psychiatric consultation and before laboratory results were available. (Ex. D at 1, 4.)

43. At 12:42 a.m., Dr. Slutzman signed a Section 12(a) application for Plaintiff's admission to MGH. (Ex. E.) The only evidence of mental illness listed was the word "paranoia," and the only evidence of likelihood of serious harm was "paranoid thoughts." The form did not check the boxes for risk of harm to self or to others. (Id.)

44. Dr. Slutzman's own note states that Plaintiff "specifically denies" suicidality, that his vital signs were unremarkable, and that he was "[r]esting comfortably." His stated reason for the hold was "Section 12 for safety for now." (Ex. C at 1–2.)

45. No Section 12(b) authorization by a designated MGH clinician appears in the record, and there is no indication that MGH admitted Plaintiff to its licensed inpatient psychiatric unit. Instead, he was "Placed in Observation Status" in the Emergency Department under "constant observation." (Ex. C at 3; Ex. F at 9.)

**D. No notice of rights, no offer of voluntary status, no access to counsel or a judge**

46. At no time during his detention at MGH did any MGH clinician or employee give Plaintiff a written notice of rights, ask him to sign one, or tell him (a) that he could ask MGH to notify CPCS so an attorney would be appointed; (b) that he could request an emergency court hearing for abuse or misuse of Section 12; or (c) that he could apply for voluntary or conditional voluntary status. No one told him any of these things orally either.

47. The MGH records contain no notice-of-rights form, no acknowledgment signed by Plaintiff, no CPCS notification request, no emergency-hearing request form, and no note documenting that any of these rights was explained. (Exs. B–K, O.)

48. Dr. Babapoorfarrokhran's 2:28 a.m. note states only that Plaintiff was told "he needs to stay in hospital until further information is obtained," that "he was agreeable," and that the decision "to continue with section 12" was "explained to the patient." (Ex. G at 1–2.) Although Plaintiff was "agreeable," no one offered him voluntary status. MGH continued the involuntary hold. (Id.)

49. Dr. Babapoorfarrokhran's stated plan was to keep Plaintiff under Section 12 "to obtain collateral information from patient's family or coworkers." (Ex. G at 2.) MGH thus held Plaintiff involuntarily in order to gather information from his employer.

**E. MGH finds Plaintiff "does not meet Section 12 criteria," and Gates MRI supplies the only new information**

50. At 12:22 p.m. on July 24, 2025, NP White documented that Plaintiff's "current, overall, acute risk of harm to self and/or others" was "Low," and that he had no suicidal, self-harm, homicidal, violent, or destructive thoughts. (Ex. H at 5.)

51. In the same note, NP White wrote: "Patient does not meet Section 12 criteria based on. Plan is for further collateral to determine disposition- likely discharge w/ PHP referral." (Ex. H at 5.)

52. Despite that finding, MGH did not release Plaintiff. It continued to confine him involuntarily for approximately six to seven more hours. Plaintiff was not free to leave during that time.

53. MGH left a voicemail for Plaintiff's manager, Chantal Sarmanoukian, whom Plaintiff had identified as a contact. She did not call back. Instead, Gates MRI's head of human resources called MGH in her place and reported that she was "not comfortable speaking w/ us d/t safety concerns." (Ex. H at 4.)

54. In that call, Gates MRI's head of human resources told MGH that three employees had complained of Plaintiff's "erratic" behavior; that he had been "aggressive towards Manager" and "hostile, screaming/yelling/threatening"; that employees "feared returning home d/t 'pt knowing their home addresses'"; and that he "was recently divorced" with a "custody issue w/ daughter." (Ex. H at 4–5.) None of the employees was identified to MGH, and MGH spoke to none of them.

55. Gates MRI's head of human resources had not seen Plaintiff on July 23 or 24, 2025, and she had no first-hand knowledge of his condition at the time of the call.

56. Between 12:22 p.m. and 5:45 p.m., Gates MRI's account was the only new information MGH documented. The record shows no new examination of Plaintiff in that interval. (Ex. H at 4–5.)

57. At 10:35 a.m. on July 24, 2025, while Plaintiff was being held at MGH, Gates MRI's Chief Operating Officer, Debra Weiss, emailed him with a copy to Ms. Boggier, marked "Importance: High." She wrote that "Stephanie and I reached out" by voicemail and that, "[u]nderstanding that you have an upcoming vacation in August, we believe it's in your best interest to take some additional PTO." She gave Ms. Boggier's number as "650-417-1595" and wrote: "Before returning to the office, we kindly ask that you connect with Stephanie or myself." The email did not mention FMLA or PFML leave.

**F. A second Section 12(a) based on Gates MRI's account, with no certified examination and no Section 12(b)**

58. At 5:45 p.m. on July 24, 2025, NP White signed a handwritten Section 12(a) application to admit Plaintiff to "McLean Belmont." (Ex. J.)

59. On that form, NP White left both boxes of item 3(b), "I have / I have not personally examined this person," unchecked. (Ex. J at 1.) The form does not certify the examination that Section 12(a) requires.

60. On the same form, the boxes for "Advanced Practice Registered Nurse" and "Licensed independent Clinical Social Worker (LICSW)" both appear to be checked. Elsewhere NP White is identified as "PMHNP-BC" and "CNP." (Ex. J at 1; Ex. H at 6; Ex. K at 2.)

61. NP White listed "unsafe thoughts" and "erratic behavior" as evidence. (Ex. J at 1.) Her own note, written about five hours earlier, documented no suicidal, homicidal, violent, or destructive thoughts and "Low" acute risk. (Ex. H at 5.) No MGH clinician documented observing erratic behavior. The only source of "erratic behavior" in the record is Gates MRI's secondhand account.

62. The Section 12(b) authorization on the reverse of NP White's application is completely blank in both copies produced: no designated clinician, no box checked, no signature, date, or time. (Ex. J at 2.)

63. At 6:08 p.m., MGH documented that Plaintiff had been accepted to McLean for 7:00 p.m., with "McLean to obtain auth." (Ex. I.)

64. MGH's Transfer Authorization states "Patient requests transfer" and "Patient consents to the transfer," but the patient signature and date lines are blank. (Ex. K at 1–2.)

Plaintiff did not request the transfer. NP White signed as "Sending MD," although she is not a physician. (Id.)

65. Plaintiff was transported to McLean by ambulance on the evening of July 24, 2025. (Ex. K at 1; Ex. I.)

**G. No judge ever reviewed Plaintiff's detention**

66. From the time Gates MRI called 911 until he was transferred to McLean, Plaintiff was held about 19 hours under two Section 12(a) applications. During that time, no one told him that he could have a lawyer appointed or ask a court for an emergency hearing, no lawyer was appointed, and no judge reviewed his detention.

67. On July 24, 2025, after arriving at McLean on a Section 12(a) application, Plaintiff signed a conditional voluntary application (Form CV-300). (Ex. L.) The circumstances under which the form was presented to him will be addressed in discovery. By then he had been held involuntarily for about 20 hours without any advisement of his rights.

68. McLean documented that it gave Plaintiff a "Civil Rights Packet" and "Notice of Rights for legal consultation." (Ex. P at 7.) No comparable entry exists anywhere in MGH's record.

69. On information and belief, but for Gates MRI's call to 911 and its later statements to MGH, Plaintiff would not have been held under Section 12 at all, or would have been released after NP White's 12:22 p.m. finding. Instead, Gates MRI's account was used to extend his detention and send him to a second hospital, and the process never gave him the chance to put that account before a judge.

70. Plaintiff was discharged from McLean at 12:30 p.m. on July 28, 2025. (Ex. S at 2; Ex. T at 1; Ex. V.)

**H. Records completed after Plaintiff left MGH**

71. Dr. Slutzman signed his Emergency Department note at 8:26 p.m. on July 24, 2025, and his attestation of PA Oesterle's note at 8:48 p.m. Both times are after Plaintiff had been accepted to McLean. (Ex. C at 3; Ex. D at 1; Ex. I.)

72. Dr. MacLean's attestation of NP White's note lists a "SERVICE DATE: 7/26/2025" and "SERVICE TIME: 10:15 AM," and states: "I saw and evaluated the patient with NP White." (Ex. H at 1.) On July 26, 2025, Plaintiff was at McLean, not MGH.

73. Dr. MacLean concluded that Plaintiff "meets criteria for IPLOC (criterion 3)," relying on "[c]ollateral from coworkers" and "coworkers expressing fear of patient." (Ex. H at 1.)

That conclusion rests on Gates MRI's account and contradicts NP White's same-day finding that Plaintiff did not meet Section 12 criteria. (Ex. H at 5.)

74. Dr. Babapoorfarrokhran's attestation of Dr. Vincent Holstein's consult note was signed at 8:31 p.m. on July 28, 2025, four days after Plaintiff left MGH. (Ex. F at 1.)

**I. What McLean found the same evening**

75. Plaintiff was first seen at McLean by Dr. Ericka Wheeler at 9:20 p.m. on July 24, 2025, about three and a half hours after NP White certified a "[v]ery substantial risk." (Ex. Q at 1; Ex. J at 1.)

76. Dr. Wheeler recorded acute risk "Low"; a suicide screen of "No Risk Indicated"; that Plaintiff "[d]enies PI, AH, VH, SI, HI, or self harm urges"; that he was "well groomed" and "cooperative" with "no loosening of associations"; "Safety Concerns: None identified"; and "History of aggression: No history reported." (Ex. P at 1–4, 6.) McLean recorded his relationship status as "Single." (Ex. P at 4.)

77. McLean's discharge summary concluded that Plaintiff had a "[n]ormative response to psychosocial stressor," that "[h]e does not meet any DSM criteria at this time," that no psychiatric medication was started "due to lack of clinical indication," and that there were no "acute safety concerns to warrant further (much less involuntary) hospitalization." (Ex. T at 5, 12.)

**J. Gates MRI's statements to MGH were false**

78. Every first-hand observation in the record contradicts what Gates MRI told MGH: Boston EMS ("calm and cooperative"); the Boston Police ("not acutely suicidal or agitated"); MGH's own psychiatric consultant ("cooperative," no violent ideation); McLean ("History of aggression: No history reported," relationship status "Single"); and the mother of Plaintiff's child, who told MGH she was "not concerned for his safety or the safety of others." (Ex. A at 1; Ex. F at 3, 6; Ex. P at 3–4; Ex. H at 4.)

79. Plaintiff has never been married and has no custody dispute concerning his daughter. Gates MRI's statement that he "was recently divorced" with a "custody issue w/ daughter" was false.

80. Plaintiff did not scream at, yell at, or threaten his manager or any coworker, and he never used or threatened to use any coworker's home address. Gates MRI's statements that he had been "aggressive towards Manager," "hostile, screaming/yelling/threatening," and that coworkers feared him because he knew their home addresses were false.

81. On information and belief, Gates MRI made these statements knowing they were false or with reckless disregard for whether they were true. It made them to a hospital it knew was deciding whether to keep Plaintiff confined, and it made them after Plaintiff had told Gates MRI himself that he was seeking help.

82. MGH and the MGH Clinicians accepted Gates MRI's secondhand account without verifying it. They used it to continue Plaintiff's detention after their own clinician had found he did not meet Section 12 criteria and to support a second Section 12(a) application. MGH also discussed Plaintiff's emergency psychiatric care with his employer's human resources department. The record documents no consent from Plaintiff for that disclosure. (Ex. H at 4.) Plaintiff did not authorize MGH to contact his employer's human resources department.

**<u>K. Gates MRI takes control of Plaintiff's leave from the first day</u>**

83. Plaintiff's inpatient hospital stay and the continuing treatment that followed are a "serious health condition" under 29 U.S.C. § 2611(11) and G.L. c. 175M, § 1. After discharge, Plaintiff began outpatient treatment on or about July 30, 2025, and continued an intensive outpatient program through his leave.

84. From July 24, 2025, Gates MRI knew that Plaintiff had been taken to a hospital for psychiatric care. Its own head of human resources had told MGH that she believed he was dangerous to his coworkers.

85. On July 25, 2025, Ms. Boggier emailed Plaintiff to follow up on "two voicemails over the last few days." She wrote that Gates MRI "fully support[s] you taking the time you need to take care of yourself" and asked to "speak on next steps, before returning to work." In the same email, she referred Plaintiff to employee assistance counseling and to crisis-incident counseling offered through Gates MRI's "security vendor and team." The email did not mention FMLA leave, PFML leave, or any other job-protected leave.

86. Gates MRI recorded the start of Plaintiff's absence as paid time off rather than medical leave, deactivated his building badge, and paused his assigned training.

87. On July 31, 2025, at 11:52 a.m. and again at 3:36 p.m., Plaintiff emailed Ms. Boggier: "I would like to begin the process of a FMLA" and asked her to send "the necessary paperwork to complete." On August 1, 2025, Ms. Boggier replied with information about Gates MRI's third-party leave administrator, Lincoln Financial, and Massachusetts paid leave, writing, "If you decide you need this, please know the MRI is here to support you." She did not send any FMLA forms or notice. Gates MRI never provided Plaintiff written notice of his FMLA eligibility, rights, and responsibilities, and it never designated his leave as FMLA leave.

88. On August 10, 2025, Plaintiff applied to the Massachusetts Department of Family and Medical Leave ("DFML") for paid medical leave, after notifying Gates MRI as the law requires.

89. On August 14, 2025, Plaintiff told HR he was ready to work. Ms. Boggier asked him to continue taking time off.

90. On August 20, 2025, Plaintiff filed a short-term disability and leave claim with Lincoln Financial. On August 21, 2025, his treating provider certified to Lincoln Financial that he could not work from August 20 through September 2, 2025, and that he could return to work full time on September 3, 2025, working from home through November 1, 2025. The provider described Plaintiff as "well groomed, attentive, calm, cooperative," with "no indication of any psychoses or delusions."

91. On August 22, 2025, Lincoln Financial approved a leave of absence for Plaintiff's own medical condition, beginning July 24, 2025, as a combination of FMLA and/or state leave and short-term disability. Lincoln's approval letter confirmed that Plaintiff had 480 hours of FMLA leave available when his leave began and directed him to contact his employer before September 2, 2025 to schedule his return. On information and belief, Lincoln, as Gates MRI's leave administrator, reported the approval to Gates MRI. Lincoln's case manager asked Plaintiff to confirm on September 2 that he would return on September 3. Lincoln applied FMLA leave to each of Plaintiff's workdays from July 24 through August 29, 2025, a total of 216 hours, and recorded that 264 hours of FMLA leave remained.

92. By August 22, 2025, in a Microsoft Teams video call conducted on Gates MRI equipment, Gates MRI human resources told Plaintiff that his return-to-work letter had to state that he would work from home 40 hours a week beginning September 3, 2025 and return to the office on November 1, 2025. The Gates MRI human resources representative on the call was Ms. Boggier. Records of that call are in Gates MRI's possession.

93. On August 28, 2025, Ms. Boggier asked Plaintiff whether he had filed for leave and asked for a doctor's letter clearing him to return. Plaintiff sent the letter and told her his state leave application was under review.

94. On October 1, 2025, DFML approved Plaintiff's leave from August 20 through September 2, 2025 under G.L. c. 175M. After Plaintiff's return, Gates MRI's payroll recorded July 24 through September 1, 2025 as a paid leave of absence. Plaintiff's September 5, 2025 pay statement reverses the regular "Salary Pay" previously paid for those weeks and replaces it with "Salary Leave Pay."

**L. Nine days after his return, Gates MRI ends Plaintiff's employment**

95. Gates MRI's own records show Plaintiff's first day back at work was September 2, 2025. Before he resumed work that day, Ms. Boggier told him to wait until they met to review his return-to-work plan. On September 4, 2025, Plaintiff sent Lincoln a return-to-work clearance from his primary care provider. On September 5, 2025, Lincoln closed his claim because he had "returned back to work."

96. On September 11, 2025, nine days after Plaintiff returned and 14 days after he told HR that his state leave application was under review, Gates MRI told him his employment was ending. At that time Plaintiff had no discipline, 264 hours of FMLA leave remained available to him, and his 2025 goals ran through the fourth quarter.

97. On September 11, 2025, on a Microsoft Teams call that Ms. Sarmanoukian conducted from her cell phone, Ms. Sarmanoukian and Ms. Boggier told Plaintiff that his employment was ending. The length of the call and whether it was recorded are matters for discovery. Gates MRI sent a written separation memo later that day and described the termination as a reduction in force. The personnel file Gates MRI produced labels the memo a "RiF" memo. Plaintiff later used the phrase "reduction in force" only because Gates MRI used it. He does not concede that his termination was a genuine reduction in force. Records of the September 11, 2025 call, including Microsoft Teams logs and the manager's call records, are in Gates MRI's possession.

98. His last working day was September 26, 2025, and he remained on Gates MRI's payroll through November 10, 2025.

99. From July 24 through September 12, 2025, Gates MRI's written communications to Plaintiff did not identify any performance or conduct concern.

100. Before Plaintiff's hospitalization, Gates MRI had given him no notice that his position was at risk. In February 2025 Gates MRI carried out what it described as a company-wide reduction in force affecting more than 40 employees, as reflected in Plaintiff's Gates MRI Microsoft Teams chats. Plaintiff was retained, and in May 2025 Gates MRI set goals for his position that ran through the fourth quarter of 2025. Gates MRI announced no further layoffs or workforce reductions to Plaintiff between February and July 2025.

101. The personnel file Gates MRI produced on or about September 2, 2026 contains no layoff selection list, no selection criteria, no record of when or by whom the decision to end his employment was made, and no notes of the September 11, 2025 meeting.

102. On information and belief, the "reduction in force" Gates MRI cited was a pretext for retaliating against Plaintiff for taking medical leave and for terminating him because it regarded him as mentally ill and dangerous. That belief rests on the following: (a) Gates MRI told Plaintiff his employment was ending nine days after he returned from approved leave; (b) he had no discipline, positive reviews, and 264 hours of FMLA leave remaining; (c) he was retained in the February 2025 reduction in force, and no further reductions were announced to him before his leave; (d) Gates MRI's personnel file contains no selection list, no selection criteria, and no record of who decided to end his employment or when; (e) Gates MRI's head of human resources had told MGH on July 24, 2025 that Plaintiff was aggressive and that coworkers feared him; and (f) the notice was given orally, on a call from his manager's cell phone, before any written explanation. Plaintiff seeks full discovery into how, when, why, and by whom the decision was made, including all records of the September 11, 2025 call.

103. The same human resources department that told MGH on July 24, 2025 that Plaintiff was dangerous and that coworkers feared him managed his leave, set the conditions of his return, and carried out the termination. On information and belief, Gates MRI ended Plaintiff's employment because of his leave and because it regarded him as mentally ill and dangerous, as its own statements to MGH show.

**<u>M. The separation agreement</u>**

104. Gates MRI presented Plaintiff with a standard separation package that required a general release. Gates MRI said the terms were non-negotiable.

105. In its September 11 materials and again on October 22, 2025, Gates MRI told Plaintiff that company-paid health coverage and severance would be available only if he signed the release. Without signing, he would have had to pay the full cost of coverage himself while unemployed. Plaintiff and his daughter were covered under Gates MRI's health plan, and Plaintiff was in ongoing treatment.

106. Plaintiff supports his daughter. After Gates MRI ended his employment, he had no other income, and the severance and company-paid coverage were the only support available to him on terms he could afford. His household expenses average about $7,000 per month.

107. Gates MRI sent the agreement through DocuSign on November 10, 2025, and Plaintiff signed later that day. Gates MRI countersigned on November 12, 2025.

108. No 2025 performance review was shared with him, and the personnel file Gates MRI produced contains none. On October 21, 2025, Gates MRI told Plaintiff it would provide no written recommendation and would only verify his dates of employment and title.

**N. Harm**

109. As a result of Gates MRI's conduct, Plaintiff lost his liberty for about 19 hours at MGH and was then sent, on a Section 12(a) application built on Gates MRI's account, to an inpatient psychiatric hospital, where he remained until July 28, 2025. In all, he was confined about four and a half days.

110. Plaintiff suffered emotional distress, humiliation, and anxiety, damage to his reputation, and the creation of medical records containing inaccurate and damaging statements, including Gates MRI's statements, that remain in his permanent chart.

111. As a result of the termination, Plaintiff has lost wages and benefits since November 11, 2025, and that loss continues. To support himself and his daughter, he has had to liquidate more than $50,000 of his retirement savings and has paid about 10 percent of that amount in early-withdrawal taxes and penalties.

112. Since September 11, 2025, Plaintiff has searched diligently for comparable work. Between October 9, 2025 and September 28, 2026, he applied to 160 positions and advanced to interviews for 22, including four final-round interviews. He has received no job offer. Between December 11, 2025 and May 27, 2026, he also received 33 recruiter inquiries about contract roles and responded to every one. None resulted in a lasting position.

## INCONSISTENCIES IN THE MGH RECORDS

113. The documents MGH and the MGH Clinicians relied on and created contain the inconsistencies below. They show that the detention rested on Gates MRI's account rather than on what clinicians observed, and that no lawful basis for continuing it existed after 12:22 p.m. on July 24, 2025.

**A. Legal-status documents**

114. Notice of rights. No notice-of-rights form, acknowledgment, CPCS request, or emergency-hearing advisement appears anywhere in the MGH record. (Exs. B–K, O.)

115. Missing Section 12(b). MGH's Section 12(a) application seeks admission to "Massachusetts General Hospital," but no Section 12(b) authorization exists. The Section 12(b) page of NP White's application is entirely blank. (Ex. E; Ex. C at 3; Ex. J at 2.)

116. Examination not certified. NP White's application leaves both "I have" and "I have not" personally examined this person unchecked. (Ex. J at 1.)

117. Wrong credential. NP White's application appears to check both "Advanced Practice Registered Nurse" and "Licensed independent Clinical Social Worker." The Transfer Authorization calls her the "Sending MD." (Ex. J at 1; Ex. K at 2.)

118. Criteria not met, then certified as met. At 12:22 p.m. NP White wrote "Patient does not meet Section 12 criteria" and rated risk "Low." At 5:45 p.m. she certified a "[v]ery substantial risk." The only intervening event documented is the call with Gates MRI. (Ex. H at 4–5; Ex. J at 1.)

119. Voluntary versus involuntary. EMS records that Plaintiff "wants to seek services at the hospital," Dr. Holstein records that he "requested to be brought to the hospital," and Dr. Babapoorfarrokhran records that he was "agreeable" to staying. Yet Section 12 was imposed and continued, and voluntary status was never offered. (Ex. A at 1, 3; Ex. F at 3; Ex. G at 1.)

120. Transfer "requested" without a signature. The Transfer Authorization says Plaintiff requested and consented to the transfer, but the patient signature lines are blank, while NP White certified at the same time that he required involuntary hospitalization. (Ex. K at 1–2; Ex. J.)

121. Section 12 planned before evaluation. PA Oesterle's 12:22 a.m. note plans to "initiate Section 12" before the psychiatric consult (2:17 a.m.) and before labs were resulted. (Ex. D at 1, 4; Ex. F at 2, 6.)

**B. Who called 911, and why**

122. Dr. Slutzman: the crisis line "were concerned for his safety and activated EMS." (Ex. C at 1.)

123. Triage RN, citing EMS: "Boss called police due to statements made." (Ex. B.) The EMS report contains no such statement. (Ex. A at 1.)

124. Dr. Pesek: Plaintiff was "[s]ent in by suicide hotline & boss." (Ex. C at 2.)

125. NP White, reporting Gates MRI's head of human resources: HR "called 911" after an instant-message exchange. (Ex. H at 4–5.)

126. Boston Police report: reporting party "Stephanie," at (650) 417-1595, Ms. Boggier's mobile number. (Ex. W at 1–2.)

127. The police report resolves the conflict. The call came from Gates MRI's human resources lead, as Gates MRI itself told MGH. Dr. Slutzman's statement that the crisis line activated EMS is not supported by any record. MGH never obtained the 911 recording or dispatch record.

**C. Risk of harm**

128. C-SSRS at 12:02 a.m.: "No Risk Indicated." Dr. Holstein at 2:16 a.m.: overall acute risk "Moderate," with no suicidal, self-harm, homicidal, or violent thoughts, and "Help-seeking behavior" listed as a protective factor. (Ex. F at 2, 8.)

129. NP White's note rates acute risk "Low" (Ex. H at 5) but also checks a box stating Plaintiff "is deemed to be at substantial risk if discharged." (Ex. H at 6.) The same note says he "will receive constant observation" and that he "did not require 1:1 observation to maintain safety." (Id.)

130. Every note lists the chief complaint as "Suicidal," and every assessment records that Plaintiff denied suicidal ideation. (Exs. A, B, C, D, F, H.)

131. Dr. MacLean concluded that Plaintiff's concerns were "also affecting his minor aged child." No record documents any risk to his child, and the child's mother told MGH she was not concerned for anyone's safety. (Ex. H at 1–2, 4.)

**D. Mental status and behavior**

132. EMS: "calm and cooperative," alert and oriented x4, GCS 15. Police: "not acutely suicidal or agitated." Triage: "Calm and cooperative with EMS." (Ex. A at 1–2; Ex. F at 3; Ex. B.)

133. Dr. Holstein (2:17 a.m.): "well groomed," "cooperative," "no loosening of associations," short-term memory "intact," judgment "fair." (Ex. F at 6.) NP White (12:22 p.m.): "mildly disheveled," "loosening of association," short-term memory "impaired," judgment "poor." (Ex. H at 3–4.) Dr. Wheeler at McLean (9:20 p.m.): "well groomed," "no loosening of associations," recall "intact 3/3," judgment "fair." (Ex. P at 6–7.)

134. Dr. MacLean: "well related, calm," "asking reasonable questions about hospitalization." (Ex. H at 1.)

135. NP White's application cites "erratic behavior." (Ex. J at 1.) No MGH clinician documented observing it. The only source is Gates MRI's secondhand report. (Ex. H at 4–5.)

**E. History and background**

136. Psychiatric history: Dr. Holstein says "[d]oes not have known psychiatric history" (Ex. F at 3) yet lists an adjustment disorder diagnosed in 2013 in the same note. NP White recasts diagnoses first made on July 24, 2025 as past history. (Ex. H at 5.)

137. The crisis call: "did not know that it was a suicide hotline" (Ex. D at 1); "calling the first number in his phone" (Ex. C at 2); "by accident" (Ex. F at 3); "saw the 800 number on a google search." (Ex. H at 2.)

138. Substance history: "Illicits: Denies" (Ex. F at 4) versus "prior substance use" in the same note (Ex. F at 3). Blood ethanol "Negative." (Ex. F at 8.)

139. Age of Plaintiff's daughter: "currently 8 yrs old" (Ex. F at 5) versus "12." (Ex. H at 2.)

140. Family circumstances: Dr. Holstein records a "good relationship with ex-girlfriend and daughter" (Ex. F at 5). Gates MRI's account, as recorded by NP White, asserts Plaintiff "was recently divorced" with a "custody issue w/ daughter." (Ex. H at 5.) McLean records "Single." (Ex. P at 4.)

141. Medications: "PDMP reviewed, no scheduled substances prescribed," immediately followed by a medication list including hydrocodone-acetaminophen and lorazepam. (Ex. F at 4.)

**F. Consent and signatures**

142. NP White wrote that Plaintiff "provided informed/verbal consent to speak with the following contacts." (Ex. H at 4.) The information MGH relied on came from Gates MRI's head of human resources, who returned a call placed to someone else. Dr. Holstein's note states that collateral is sought without consent "only... when necessary to determine acute risk of harm" and that "minimal clinical information is released." (Ex. F at 3.)

143. Boston EMS certified that Plaintiff "was physically or mentally incapable of signing," although the same report documents him as alert, oriented x4, GCS 15, calm, and cooperative. (Ex. A at 1–2, 6.)

**G. MGH's conclusions compared with McLean's**

144. Diagnosis. MGH diagnosed "[u]nspecified psychosis" and "[u]nspecified mood disorder." McLean concluded "[n]ormative response to psychosocial stressor" and "does not meet any DSM criteria." (Ex. F at 9; Ex. H at 6; Ex. T at 5.)

145. The "SI" label. McLean's admission formulation states that Plaintiff "presents today with paranoia and SI," while the same note records no suicidal ideation, a screen of "No Risk Indicated," and "Low" risk. (Ex. P at 1, 3, 7.) On information and belief, the label was carried forward from the "Suicidal" chief complaint that began with the 911 call.

146. Aggression. McLean: "History of aggression: No history reported." Gates MRI, as recorded by MGH: "aggressive towards Manager," "hostile, screaming/yelling/threatening." (Ex. P at 3; Ex. H at 5.)

147. Medication. MGH's contingency orders included intramuscular haloperidol and lorazepam for agitation. McLean found no clinical indication for any psychiatric medication. (Ex. F at 9; Ex. T at 5.)

**EVIDENCE HELD BY NON-PARTIES**

148. The 911 call. The audio recording, call-detail record, and dispatch log for the call that led to Boston EMS Incident No. 252040470 (dispatched 11:27:52 p.m., July 23, 2025), and Boston Police Incident Report I# 252060027 (CAD Event No. P250352154), will establish exactly what Ms. Boggier told the police, from where, and on what information. The officers' body-worn camera video, which the report links on Evidence.com, will show Plaintiff's demeanor and what he and the officers said. These records are held by the Boston Police Department, including its 911 Operations Center and its Evidence.com account, Boston EMS, and the Massachusetts State 911 Department. Call-detail records for (650) 417-1595 are held by that number's wireless carrier. On information and belief, the recording may also reveal whether Gates MRI was monitoring Plaintiff's communications, as described in ¶¶ 36 to 40, and whether Gates MRI had opened an internal investigation or inquiry concerning Plaintiff before or on July 23, 2025, and what Gates MRI personnel knew about him and told emergency responders.

149. Plaintiff has obtained only part of these records. On September 3, 2026, he asked the Boston Police Department under the Public Records Law for the incident report, the 911 recording, and all communications between Gates MRI and the Department. The same day, the Department's records liaison replied that she found no reports under the names Plaintiff provided. After Plaintiff asked on September 11, 2026 that the Department search all calls that evening, the Department generated Incident Report I# 252060027 on September 14, 2026 and provided Plaintiff a redacted copy. (Ex. W.) The Department has not produced the 911 audio, the dispatch record, or the body-worn camera video. On September 30, 2026, Plaintiff asked the Massachusetts State 911 Department for the recording of the call from (650) 417-1595. On October 5, 2026, that Department responded that it needed more detail, such as the caller's location, to locate the record, and noted that the Boston Police 911 Center may also hold records. Plaintiff has not yet submitted a modified request. Plaintiff will promptly serve subpoenas under Fed. R. Civ. P. 45 on the Boston Police Department (for the 911 audio, the CAD record for Event No. P250352154, and the body-worn camera video), Boston EMS, the Massachusetts State

911 Department, and the wireless carrier for (650) 417-1595, and asks that all of these records be preserved.

150. The crisis-line records. The 988 Lifeline's call records for Plaintiff's call on July 23, 2025 will show what Plaintiff said and whether the crisis line contacted 911, as Dr. Slutzman recorded, or did not, as Gates MRI's account implies. The crisis line will not release them without a court order, and Plaintiff will ask the Court for one.

151. Gates MRI's records. Gates MRI holds records that Plaintiff can no longer reach, including: the workplace messaging exchange between Plaintiff and its head of human resources on July 23, 2025; its records of any call to 911 or to MGH; any written complaints by the "3 other employees" it described to MGH (Ex. H at 4–5); the Microsoft Teams records of the return-to-work call described in ¶ 92; the Teams logs, call records, and notes of the September 11, 2025 call; Plaintiff's Teams chats concerning the February 2025 reduction in force; all records of any internal investigation, complaint, or inquiry concerning Plaintiff, whenever opened; the mobile-device policy Plaintiff signed and any related enrollment records; the change history of Plaintiff's home address in Gates MRI's Workday and HR systems; all mobile-device-management, security, and access logs for any phone, account, or device Plaintiff used for Gates MRI work, from June 1, 2025 through November 10, 2025, including any records of location, message, or call data obtained from them; all audio and video recordings, transcripts, and notes of any telephone, Microsoft Teams, or other call or meeting involving or concerning Plaintiff from July 1, 2025 through November 10, 2025, including the September 11, 2025 call; and all records of the decision to end his employment. Plaintiff asks that Gates MRI preserve all of these records, including any recordings, in their original form and will seek them in discovery.

152. Plaintiff reserves the right to seek leave under Fed. R. Civ. P. 15 and 20 to amend this complaint, including to add parties, once these records are obtained.

## COUNT I: RETALIATION AND FAILURE TO RESTORE

*(PFML, G.L. c. 175M, §§ 2(e), 9) (against Gates MRI)*

153. Plaintiff incorporates paragraphs 1 through 152.

154. Plaintiff exercised rights under G.L. c. 175M by applying for and taking approved paid medical leave for a serious health condition.

155. Gates MRI discharged him nine days after his return and within six months of his leave. Under G.L. c. 175M, § 9(c), that action is presumed to be retaliation, and Gates MRI can rebut the presumption only by clear and convincing evidence of an independent justification.

156. Gates MRI failed to restore Plaintiff to his position or an equivalent one as G.L. c. 175M, § 2(e) requires.

157. Plaintiff is entitled to damages under G.L. c. 175M, § 9(d), including up to three times his lost wages, and to reinstatement and costs.

**COUNT II: RETALIATION**
*(FMLA, 29 U.S.C. § 2615(a)(2)) (against Gates MRI)*

158. Plaintiff incorporates paragraphs 1 through 152.

159. Plaintiff engaged in protected activity by requesting and taking FMLA-qualifying leave.

160. Gates MRI terminated his employment nine days after his return. No discipline or performance concern came between his return and the termination notice, and the close timing supports an inference that his leave was a motivating cause.

**COUNT III: INTERFERENCE**
*(FMLA, 29 U.S.C. § 2615(a)(1)) (against Gates MRI)*

161. Plaintiff incorporates paragraphs 1 through 152.

162. Plaintiff was an eligible employee entitled to FMLA leave for a serious health condition, including inpatient care. He had worked for Gates MRI for at least 12 months and at least 1,250 hours in the preceding 12 months, and Gates MRI's leave administrator approved his leave on that basis.

163. Gates MRI interfered with his FMLA rights from the first day of his absence. It directed him to take paid time off rather than leave and recorded his absence that way, deactivated his access, never gave him written notice of his FMLA eligibility, rights, and responsibilities after he asked for FMLA leave on July 31, 2025, kept him out of work after he said he was ready to return, and failed to restore him to his position or an equivalent one under 29 U.S.C. § 2614(a)(1). It also treated his leave as a negative factor in ending his employment. 29 C.F.R. § 825.220(c).

164. Gates MRI's violation was willful or without good faith, entitling Plaintiff to liquidated damages under 29 U.S.C. § 2617(a)(1)(A)(iii).

**COUNT IV: DISABILITY DISCRIMINATION**
*(ADA, 42 U.S.C. § 12112(a)) (against Gates MRI)*

165. Plaintiff incorporates paragraphs 1 through 152.

166. Plaintiff is an individual with a disability under 42 U.S.C. § 12102(1)(C) because Gates MRI regarded him as having a mental impairment. Gates MRI told MGH that he was aggressive and threatening and that coworkers feared him; removed him from work; deactivated his access; required medical clearance; and kept him out after he said he was ready to return. The impairment Gates MRI perceived was neither transitory nor minor, because it led to inpatient care and months of treatment.

167. Plaintiff was qualified for his position and could perform its essential functions, as his provider's clearance and Gates MRI's own return plan confirmed.

168. Gates MRI ended Plaintiff's employment because it regarded him as having a mental impairment. Any reason Gates MRI offers is a pretext.

**COUNT V: RETALIATION**
*(ADA, 42 U.S.C. § 12203(a)) (against Gates MRI)*

169. Plaintiff incorporates paragraphs 1 through 152.

170. Plaintiff engaged in protected activity by requesting leave as an accommodation for his condition.

171. Gates MRI terminated his employment nine days after his return from that leave because of his protected activity.

**COUNT VI: DISABILITY DISCRIMINATION AND RETALIATION**
*(G.L. c. 151B, §§ 4(4), 4(16)) (against Gates MRI)*

172. Plaintiff incorporates paragraphs 1 through 152.

173. Plaintiff is a person with a handicap within the meaning of G.L. c. 151B, § 1(17), including because Gates MRI regarded him as having a mental impairment, and he was qualified to perform his job.

174. Gates MRI discriminated against Plaintiff because of his handicap by ending his employment, and retaliated against him for requesting leave as an accommodation, in violation of G.L. c. 151B, §§ 4(16) and 4(4).

175. Plaintiff is entitled to relief under G.L. c. 151B, § 9.

**COUNT VII: FALSE IMPRISONMENT BY INSTIGATION**
*(Massachusetts common law) (against Gates MRI)*

176. Plaintiff incorporates paragraphs 1 through 152.

177. A person who instigates or procures another's confinement by giving false information to those who carry it out is liable for that confinement.

178. Gates MRI, through Ms. Boggier, reported Plaintiff to the Boston Police on July 23, 2025. (Ex. W at 1–2.) On information and belief, she described him in terms that caused emergency responders to treat him as suicidal and dangerous, although he had told Gates MRI that he was seeking help and was going to the hospital.

179. After MGH's own clinician found that Plaintiff did not meet Section 12 criteria, Gates MRI gave MGH false statements that he was aggressive and threatening, that coworkers feared him, and that he was recently divorced with a custody dispute. MGH relied on those statements to continue his confinement and to send him involuntarily to McLean.

180. Plaintiff was aware of his confinement and did not consent to it. Gates MRI's conduct was a substantial cause of the confinement from July 24 through July 28, 2025, and of the damages described above.

**COUNT VIII: DEFAMATION**
*(Massachusetts common law) (against Gates MRI)*

181. Plaintiff incorporates paragraphs 1 through 152.

182. On July 24, 2025, Gates MRI, through its head of human resources acting within the scope of her employment, published to MGH clinicians the statements set out in ¶ 54.

183. The statements were false and defamatory. They accused Plaintiff of threatening and aggressive conduct toward coworkers and stated false facts about his family life.

184. Any privilege Gates MRI may claim for statements to a medical provider was abused, because Gates MRI made the statements knowing they were false or with reckless disregard for their truth, and beyond any legitimate need.

185. The statements caused Plaintiff economic and reputational harm. They were used to prolong his confinement, they remain in his permanent medical record, and they were repeated in later clinical notes.

**COUNT IX: MASSACHUSETTS CIVIL RIGHTS ACT**
*(G.L. c. 12, §§ 11H–11I) (against Gates MRI)*

186. Plaintiff incorporates paragraphs 1 through 152.

187. Plaintiff has rights secured by the Constitution and laws of the Commonwealth, including the right to liberty and due process under Articles 1, 10, and 12 of the Massachusetts Declaration of Rights, and the statutory rights under G.L. c. 123, § 12 and 104 CMR 27.07.

188. Gates MRI interfered with those rights by coercion. Plaintiff was physically confined under constant observation without the notice, access to counsel and a judge, examination, and authorization the law requires. Gates MRI procured Plaintiff's physical confinement through its 911 report and its false statements to MGH, and it caused his detention to be extended and transferred to a second hospital after MGH had found he did not meet Section 12 criteria.

189. Plaintiff is entitled to damages and to reasonable attorney's fees and costs under G.L. c. 12, § 11I.

**COUNT X: DECLARATORY JUDGMENT: SEPARATION AGREEMENT**
*(28 U.S.C. § 2201) (against Gates MRI)*

190. Plaintiff incorporates paragraphs 1 through 152.

191. Gates MRI contends, or will contend, that Section 4.1 of the separation agreement releases Plaintiff's claims, including his claims arising from the events of July 23 and 24, 2025.

192. The release is unenforceable or voidable because Plaintiff signed it under economic duress that Gates MRI created. Gates MRI ended his employment without warning, nine days after he returned from protected leave and while he was still in treatment. It then offered severance and company-paid health coverage for him and his daughter only if he released every claim, and it refused to negotiate. Signing was the only way for Plaintiff to obtain that support without bearing the full cost of coverage himself, so the release was not knowing and voluntary.

193. To the extent the release purports to waive claims that the law does not allow to be released, it is void.

194. An actual controversy exists. Plaintiff seeks a declaration that the release does not bar the claims in this action.

**PRAYER FOR RELIEF**

Plaintiff requests that the Court:

A. Enter judgment for Plaintiff on all counts;

B. Declare that Gates MRI violated the ADA, the FMLA, G.L. c. 175M, and G.L. c. 151B;

C. Declare that Section 4.1 of the separation agreement does not bar the claims in this action;

D. Order reinstatement or, in lieu of reinstatement, front pay;

E. Order Gates MRI to complete Plaintiff's 2025 performance review consistent with his prior reviews and to issue a written reference or, at a minimum, a statement of his dates of employment and title, that he separated in good standing, and that he is eligible for rehire;

F. Award back pay and lost benefits from November 11, 2025, with interest;

G. Award liquidated damages under 29 U.S.C. § 2617(a)(1)(A)(iii), and up to three times lost wages under G.L. c. 175M, § 9(d), without double recovery;

H. Award compensatory damages, including for emotional distress, reputational harm, and loss of liberty, and punitive damages under 42 U.S.C. § 1981a and G.L. c. 151B;

I. Authorize discovery from non-parties, including production of the 911 recording, CAD record, and body-worn camera video for Boston Police Incident Report I# 252060027 (CAD Event No. P250352154), the dispatch records for Boston EMS Incident No. 252040470, and the records of the crisis line Plaintiff called on July 23, 2025;

J. Award costs and attorney's fees permitted under 29 U.S.C. § 2617(a)(3), 42 U.S.C. § 12205, G.L. c. 175M, § 9(d), G.L. c. 151B, § 9, and G.L. c. 12, § 11I;

K. Award pre-judgment and post-judgment interest; and

L. Grant any other relief the Court deems just.

**Plaintiff's Statement of Intent Regarding Any Recovery.** Plaintiff brings this action to vindicate his rights, not for personal enrichment. Having experienced the violation of his own civil and human rights, Plaintiff intends to donate any compensation he receives in this action beyond his lost wages and benefits to charitable organizations that serve underserved and underprivileged communities around the world, including women, children, the sick, veterans, and LGBTQ individuals. This statement does not limit the relief Plaintiff requests above.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable under Federal Rule of Civil Procedure 38.

Dated: November 17, 2026

Respectfully submitted,

Ryan J. Capuano, Plaintiff, pro se
8 Grafton St., #709
Worcester, MA 01604
(617) 308-2212
rcapuano1@worcester.edu